WEST CAPITOL, INC., Plaintiff-Appellant,†

v.

VILLAGE OF SISTER BAY, Defendant-Respondent.

Court of Appeals

*No. 2013AP1458. Oral Argument March 15, 2014.
—Decided April 15, 2014.*

2014 WI App 52

(Also reported in 848 N.W.2d 875.)

† Petition for Review denied September 25, 2014.

133

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Michael J. Lund* of *Stafford Rosenbaum LLP*, Milwaukee. There was oral argument by *Michael J. Lund* and *Terrence C. Thom*.

On behalf of the defendant-respondent, the cause was submitted on the brief of and argument by *Bree A. Madison* of *Silton Seifert Carlson, S.C.*, Appleton.

Before Hoover, P.J., Mangerson and Stark, JJ.

¶ 1. STARK, J. West Capitol, Inc., appeals from a judgment that reduced the 2009 assessment of the value of real property it owns in the Village of Sister Bay from $4,487,500 to $3,935,000. West Capitol claims the circuit court erred in two respects. First, West Capitol argues it is entitled to a fifty-percent reduction in the 2009 assessment because its property meets the statutory definition of "undeveloped land." *See* WIS. STAT. §§ 70.32(2)(c)4., (4).[1] Second, West Capitol argues the circuit court erred by concluding the property's

---

[1] The relevant statutes have not changed since 2009. All references to the Wisconsin Statutes are therefore to the 2011–12 version unless otherwise noted.

assessed value in 2009 should have been the same as in 2010. West Capitol argues the court should have instead adopted the valuation West Capitol's appraiser proposed. Alternatively, West Capitol argues the court should have ordered a reassessment.

¶ 2. We conclude the circuit court properly determined West Capitol's property does not meet the statutory definition of "undeveloped land." We also conclude the court properly rejected the valuation proposed by West Capitol's appraiser. However, we agree with West Capitol that the court erroneously exercised its discretion by proceeding to judgment without ordering a reassessment. We therefore affirm in part, reverse in part, and remand with directions to order a reassessment.

## BACKGROUND

¶ 3. West Capitol's property is a 16.86–acre parcel in Sister Bay with about 610 feet of Green Bay shoreline. The parties have stipulated that the property: (1) is heavily wooded and "preserved in its natural state;" (2) does not contain any buildings or dwellings; (3) is not used for agricultural or manufacturing purposes; (4) is not primarily devoted to buying and reselling goods for a profit; (5) is not used for the production of commercial forest products; and (6) was zoned "B-1 general business district" as of January 1, 2009. It is also undisputed that the property does not generate any income. In addition, West Capitol clarified at oral argument that the property is not used as collateral.

¶ 4. In 2008, the Village assessed West Capitol's property at $4,575,000. This was an increase of $2,135,000 from the 2007 assessment. West Capitol apparently did not challenge the 2008 assessment. In

2009, the property was again assessed at $4,575,000. West Capitol objected to the 2009 assessment before the Village's Board of Review. Following a hearing, the Board of Review reduced the 2009 assessment to $4,487,500.

¶ 5. West Capitol paid its 2009 property taxes under protest and filed an excessive assessment claim with the Village. *See* WIS. STAT. § 74.37(1). The Village disallowed the claim by failing to act on it within ninety days. *See* WIS. STAT. § 74.37(3)(a). West Capitol then filed the instant lawsuit against the Village, asserting the 2009 assessment was excessive. *See* WIS. STAT. § 74.37(3)(d). West Capitol claimed the full value of its property was only $2,440,000. In addition, West Capitol asserted the assessed value should have been reduced to $1,220,000—fifty percent of the full value—because the property qualified as "undeveloped land." *See* WIS. STAT. §§ 70.32(2)(c)4., (4). The Village's assessor, Michael Walker, had classified West Capitol's property as residential, rather than undeveloped.

¶ 6. The Village answered West Capitol's complaint, denying that the 2009 assessment was excessive and asserting the property was not entitled to a fifty-percent reduction in assessment. West Capitol then moved for partial summary judgment, arguing the undisputed facts showed the property qualified as undeveloped land. The circuit court denied West Capitol's motion. In a written decision, the court stated it had "serious reservations" that West Capitol's property met the statutory definition of undeveloped land, but West Capitol would "be afforded the opportunity to establish facts contrary to [those] reservations" at trial. West Capitol moved for reconsideration, which the court denied.

¶ 7. A trial to the court was held on August 9, 2012. Walker testified he completed a village-wide reassessment of waterfront properties in Sister Bay in 2008. He began by identifying seventeen sales of waterfront properties in Sister Bay and the neighboring town of Liberty Grove that occurred between October 2000 and July 2008. For each of those properties, Walker calculated the price per foot of shoreline, or "indicated shoreline value" (ISV), by dividing the purchase price by the number of shoreline feet. Walker then used these ISVs to determine ISVs for the remaining waterfront properties in Sister Bay.

¶ 8. A map showing the seventeen properties Walker used as the basis for the 2008 reassessment was introduced at trial as Exhibit 3. To value West Capitol's property in 2008 and 2009, Walker testified he identified three properties shown on Exhibit 3 that he felt were "most pertinent" to West Capitol's property. The properties Walker selected had ISVs of $7,000, $5,437, and $5,253 per shoreline foot, respectively. Based on those ISVs, Walker determined West Capitol's property had an ISV of $7,500 per shoreline foot. Multiplied by 610 feet of shoreline, this resulted in an assessed value of $4,575,000.

¶ 9. Walker testified he used a different method to assess West Capitol's property in 2010. First, he used a reduced ISV of $5,500 per shoreline foot. This resulted in a value of $3,355,000 for the shoreline only. Next, Walker valued the inland acreage at $2 per square foot, which amounted to $893,850. He then reduced the value of the inland acreage by thirty-five percent to $580,000. By adding this number to the value of the shoreline, Walker arrived at a total assessed value of $3,935,000.

¶ 10. Walker conceded he classified West Capitol's property as residential in 2009, even though it was "vacant," "had no use," and was zoned B-1 general business district. He also conceded he reclassified the property as commercial in 2012. However, he asserted he believed in 2009 that the property's most likely use was residential. He later clarified he believed the property's highest, best, and most likely use was a development "with a combination of commercial and residential improvements."

¶ 11. Appraiser Tom Rentmeester testified on behalf of West Capitol. He opined West Capitol's property was worth only $2,602,000 as of January 1, 2009. He reached this valuation by assuming a hypothetical 2.8–acre waterfront lot that was 200 feet deep with 610 feet of shoreline. Based on the sales of three other waterfront properties in Door County, Rentmeester concluded this hypothetical parcel would have an ISV of $4,000 per shoreline foot, resulting in a total value of $2,462,000. Because West Capitol's property comprises about 16.86 acres, Rentmeester then assumed the hypothetical 2.8–acre parcel was contiguous to a fourteen-acre inland parcel. He valued the inland parcel at $10,000 per acre, or $140,000. By adding this value to that of the shoreline parcel, Rentmeester concluded West Capitol's property was worth $2,602,000. He testified residential use would be the highest and best use of the property.

¶ 12. Following trial, the circuit court issued a written decision setting aside the 2009 assessment as excessive. The court acknowledged that, "in undertaking the 2008 [village-wide] reassessment[,] [Walker] followed an approved method of attempting to assess all waterfront properties within the Village." The court noted Walker "tracked the sale of all waterfront prop-

138

erties within the Village[,]" which "enabled him to identify trends and changes in the market value of those unique properties to appropriately and accurately assess the value of those properties." The court found that his method "represented an appropriate comparable sales or market approach to valuing shoreland properties within the Village."

¶ 13. Nevertheless, the court rejected Walker's 2009 assessment of West Capitol's property. The court noted the 2009 assessment was based on sales of three waterfront properties with ISVs of about $7,000, $5,200, and $5,400 per shoreline foot, respectively. The average ISV for those properties was $5,866.67 per shoreline foot. However, Walker assessed West Capitol's property using an ISV of $7,500 per shoreline foot. The court asserted Walker failed to provide a "specific explanation of how he came up with that number." The court also observed Walker had reduced the assessed value of West Capitol's property to $3,935,000 in 2010. The court stated, "I have extreme difficulty understanding how the fact that a municipality lowers a taxpayer's assessment by 12% in a subsequent year is not relevant when the taxpayer is arguing that the previous year's assessment was excessive." For these reasons, the court concluded the 2009 assessment was "not pursuant to law or the Wisconsin Property Assessment Manual."

¶ 14. Despite rejecting Walker's 2009 assessment, the court also refused to adopt Rentmeester's valuation. The court noted Rentmeester was "only a residential appraiser" and was not "certified to do commercial appraisals." The court also observed that Rentmeester defined the "neighborhood of the subject premises" as "waterfront properties that are located north of Sturgeon Bay, south of Gills Rock, east of the waters of Green Bay and west of Lake Michigan"—an area thirty-

139

five miles long and ten miles wide. The court stated, "The nature, use and development of the waterfront properties within 'this neighborhood' vary drastically." Finally, the court suggested the properties Rentmeester used to reach his valuation were not actually comparable to West Capitol's property. The properties did not have equivalent sewer and water. One was on Lake Michigan, instead of Green Bay. All three properties required large net adjustments. The court therefore concluded it was "not persuaded with the reliability or accuracy of [Rentmeester's] appraisal[.]"

¶ 15. Although it rejected both Walker's and Rentmeester's valuations, the court declined to order a reassessment of West Capitol's property. *See* Wis. Stat. § 74.39(1). Instead, the court proceeded to judgment without ordering a reassessment, finding that doing so would be "in the best interest of all the parties to the action" and that the court was "able to determine an appropriate and valid assessment for the property with reasonable certainty." *See* Wis. Stat. § 74.39(3). The court concluded the property's assessed value for 2009 should have been $3,935,000—the amount of the 2010 assessment.

¶ 16. Finally, the court rejected West Capitol's argument that the 2009 assessment should have been reduced by fifty percent because the property qualified as undeveloped land under Wis. Stat. § 70.32(2)(c)4. The court reasoned:

> I disagree with [West Capitol's] argument that vacant parcels in the State of Wisconsin are nonproductive lands and would fall within [the statutory] definition of 'Undeveloped land'. I do not believe it was the Wisconsin Legislature's intent that all vacant parcels in the State of Wisconsin would be eligible for the 50% reduction in assessment under [Wis. Stat. §] 70.32(4)[.]

140

¶ 17. West Capitol subsequently moved the court to reconsider its ruling that the property did not qualify as undeveloped land. The court denied West Capitol's motion and entered a final judgment stating the property should have been assessed at $3,935,000 in 2009, and West Capitol was therefore entitled to a refund of $6,072.52 in excess property taxes. West Capitol now appeals.

## DISCUSSION

¶ 18. On appeal, West Capitol renews its argument that its property should have been classified as undeveloped land. It also contends the circuit court should have accepted Rentmeester's valuation or, in the alternative, ordered a reassessment. We address these arguments in turn.

## I. Classification as undeveloped land

¶ 19. Determining whether West Capitol's property qualified as "undeveloped land" in 2009 requires us to interpret Wis. Stat. § 70.32(2)(c)4. and apply it to a set of undisputed facts. These are questions of law that we review independently. *See McNeil v. Hansen*, 2007 WI 56, ¶ 7, 300 Wis. 2d 358, 731 N.W.2d 273.

¶ 20. "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. Our analysis begins with the language of the statute. *Id.*, ¶ 45. We give statutory language its common, ordinary, and accepted

meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning. *Id.* In addition, we interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46. " 'If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning.' " *Id.* (quoting *Bruno v. Milwaukee Cnty.*, 2003 WI 28, ¶ 20, 260 Wis. 2d 633, 660 N.W.2d 656). However, if the statute is ambiguous—that is, reasonably susceptible to more than one interpretation—we examine extrinsic sources, such as legislative history, to ascertain the legislature's intent. *Id.*, ¶¶ 47, 50–51. We may also use canons of statutory construction to aid our interpretation of an ambiguous statute. *See State v. Peters*, 2003 WI 88, ¶ 14, 263 Wis. 2d 475, 665 N.W.2d 171.

¶ 21. WISCONSIN STAT. § 70.32(2)(a) directs municipal assessors to divide real property into the following eight classes: "1. Residential. 2. Commercial. 3. Manufacturing. 4. Agricultural. 5. Undeveloped. 5m. Agricultural forest. 6. Productive forest land. 7. Other." In 2009, Walker classified West Capitol's property as residential. The residential class "includes any parcel or part of a parcel of untilled land that is not suitable for the production of row crops, on which a dwelling or other form of human abode is located and which is not otherwise classified under this subsection." WIS. STAT. § 70.32(2)(c)(3).

¶ 22. West Capitol contends its property should have been classified as undeveloped. Pursuant to WIS.

STAT. § 70.32(4), undeveloped land "shall be assessed at 50% of its full value[.]" " 'Undeveloped land' means bog, marsh, lowland brush, uncultivated land zoned as shoreland under s. 59.692 and shown as a wetland on a final map under s. 23.32 or other nonproductive lands not otherwise classified under this subsection." WIS. STAT. § 70.32(2)(c)4. The parties agree the portion of this definition potentially applicable to West Capitol's property is "other nonproductive lands not otherwise classified under this subsection." *See id.* Thus, to qualify as undeveloped in 2009, West Capitol's property had to be both: (1) nonproductive land; and (2) not otherwise classified under § 70.32(2). As explained below, we conclude West Capitol's property did not satisfy either prong of this definition. Accordingly, the circuit court correctly ruled West Capitol was not entitled to a fifty-percent reduction in the 2009 assessment.

## A. *Nonproductive land*

¶ 23. WISCONSIN STAT. § 70.32(2) does not define the term "nonproductive." Citing WEBSTER'S NEW COLLEGIATE DICTIONARY 781 (1977), West Capitol argues "nonproductive" unambiguously means "not productive: as . . . failing to produce or yield[.]" *See Tele-Port, Inc. v. Ameritech Mobile Commc'ns, Inc.*, 2001 WI App 261, ¶ 17, 248 Wis. 2d 846, 637 N.W.2d 782 (where a statutory term is undefined, court may look to a recognized dictionary for guidance). West Capitol argues the undisputed facts show that its property met this definition for the year 2009.

¶ 24. Specifically, West Capitol notes a property must be assessed "as of the close of January 1" of the assessment year. WIS. STAT. § 70.10. West Capitol asserts it is undisputed that, as of January 1, 2009, its property

143

was not being used for agricultural or manufacturing purposes, was not primarily devoted to buying and reselling goods for a profit, was not used for the production of commercial forest products, and did not contain any building or dwelling. West Capitol also observes the property did not produce any income. Further, the property was not used as collateral. West Capitol therefore argues the only reasonable conclusion is that the property was "nonproductive"—that is "failing to produce or yield"—as of January 1, 2009. *See* WEBSTER'S, *supra,* at 781.

¶ 25. The Village also asserts WIS. STAT. § 70.32(2)(c)4. is unambiguous. However, contrary to West Capitol's position, the Village contends West Capitol's "perfectly developable shorefront acres" are not the type of property the legislature intended to be classified as undeveloped. The Village suggests the relevant inquiry is not whether West Capitol's property is currently failing to produce or yield, but whether the property is capable of productive use.

¶ 26. We conclude the term "nonproductive" is ambiguous. Under the dictionary definition of "nonproductive" cited by West Capitol, land is nonproductive when it is currently failing to produce or yield. *See* WEBSTER'S, *supra,* at 781. Applying this definition, West Capitol's property was nonproductive on January 1, 2009, because it was not producing or yielding anything. However, a different dictionary defines nonproductive as "not producing *or able to produce* goods, crops, or economic benefit[.]" NEW OXFORD AMERICAN DICTIONARY 1165 (2001) (emphasis added). Under this definition, West Capitol's property was not nonproductive on January 1, 2009, because it was capable of producing economic benefit. The result therefore differs depending on which dictionary definition of "non-

productive" one applies. Both dictionaries provide reasonable definitions of the term. Consequently, the term "nonproductive" is subject to multiple reasonable interpretations and is ambiguous.

¶ 27. Because the term "nonproductive" is ambiguous, we may look to extrinsic sources such as legislative history to ascertain the legislature's intent. *Kalal*, 271 Wis. 2d 633, ¶¶ 50–51. However, the parties have not cited, and our research has not revealed, anything in the legislative history of Wis. Stat. § 70.32(2) that sheds light on the intended meaning of the term "nonproductive."[2] Nevertheless, we agree with the Village that the ambiguity can be clarified by applying the ejusdem generis canon of statutory construction.

---

[2] The Village observes the type of real property now classified as "undeveloped" was formerly classified as "swamp or waste." *See* Wis. Stat. §§ 70.32(2)(a)5., 70.32(2)(c)4. (2001–02). In 2003, the legislature renamed the "swamp or waste" class "undeveloped," but it defined "undeveloped land" using the same definition that was previously used for "swampland or wasteland." *See* 2003 WI Act 33, §§ 1536e, 1536i. The Village argues this shows the legislature intended the "undeveloped" class to include only swampland and wasteland. The Village also argues it would be absurd to conclude that the legislature, by changing the name of the class from "swamp or waste" to "undeveloped," intended to "cut property taxes on all unimproved property in half."

The Village's legislative history argument is unconvincing. It is equally plausible that, by changing the name of the class from "swamp or waste" to "undeveloped," the legislature intended to signify that the class includes property that does not strictly qualify as swampland or wasteland. Interestingly, the same act that changed the name of the "swamp or waste" class to "undeveloped" added the provision that undeveloped land is entitled to assessment at fifty percent of its full value. *See* 2003 WI Act 33, §§ 1536e, 1536p. Nothing in the legislative history of Wis. Stat. § 70.32 clarifies the intent behind the legislature's decision to rename the "swamp or waste" class "undeveloped."

¶ 28. *Ejusdem generis* is Latin for "of the same kind or class[.]" BLACK'S LAW DICTIONARY 556 (8th ed. 2004). It refers to the rule of construction that "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed." *Id.* WISCONSIN STAT. § 70.32(2)(c)4. defines "undeveloped land" using a nonexhaustive list of specific examples: bog,[3] marsh,[4] lowland brush,[5] and "uncultivated land zoned as shoreland under s. 59.692 and shown as a wetland on a final map under s. 23.32[.]"[6] These specific examples are followed by the general phrase "or other nonproductive lands not otherwise classified[.]" WIS. STAT. § 70.32(2)(c)4. West Capitol's property does not seem to fit within the general class of properties to which the specific examples listed in the statute belong. There is no evidence the property is marshy, swampy, low-lying, or classified as wetland. The examples listed in the statute seem to be types of land that are incapable of productive use, which is consistent with the NEW OXFORD AMERICAN DICTIONARY definition of nonproductive.

¶ 29. Moreover, in WIS. STAT. § 70.32(2)(c)2., the legislature defined the term "productive forest land" as

[3] WEBSTER'S NEW COLLEGIATE DICTIONARY 124 (1977), defines "bog" as "wet spongy ground; *esp* : a poorly drained usu[ally] acid area rich in plant residues, frequently surrounding a body of open water, and having a characteristic flora (as of sedges, heaths, and sphagnum)[.]"

[4] "Marsh" is defined as "a tract of soft wet land usu[ally] characterized by monocotyledons (as grasses or cattails)[.]" WEBSTER'S, *supra,* at 705.

[5] "Lowland" is "low or level country[.]" WEBSTER'S, *supra,* at 682. "Brush" is "scrub vegetation" or "land covered with scrub vegetation[.]" WEBSTER'S, *supra,* at 142.

[6] "Uncultivated" means "not used for growing crops." NEW OXFORD AMERICAN DICTIONARY 1839 (2001).

"land that is producing or *is capable of producing* commercial forest products and is not otherwise classified under this subsection." (Emphasis added.) The legislature's use of the term "productive" to mean land that is either producing or capable of producing suggests the legislature intended the term nonproductive to mean land that is neither producing nor capable of producing. We therefore conclude that, under § 70.32(2)(c)4., land is nonproductive when it is neither producing nor capable of productive use. Because West Capitol's property was capable of productive use on January 1, 2009, it was not nonproductive.

¶ 30. West Capitol argues this interpretation of WIS. STAT. § 70.32(2)(c)4. conflicts with WIS. STAT. § 70.10, which states real property must be assessed "as of the close of January 1 of each year." West Capitol asserts that, under § 70.10, property must be classified based on its actual use on January 1 of the assessment year, rather than its potential future use. However, nothing in § 70.10 requires a property to be classified based on its actual use. As discussed above, the term nonproductive can reasonably be read to mean neither producing nor capable of productive use, and the doctrine of ejusdem generis supports that interpretation. The relevant inquiry is therefore whether West Capitol's property was incapable of productive use as of January 1, 2009. This analysis does not conflict with the statutory requirement that property be assessed "as of the close of January 1 of each year." *See* WIS. STAT. § 70.10.[7]

---

[7] In addition, as noted above, WIS. STAT. § 70.32(2)(c)2. defines "productive forest land" as "land that is producing or is capable of producing commercial forest products and is not otherwise classified under this subsection" WISCONSIN STAT. § 70.32(2)(c)1d. similarly states that "agricultural forest land" is

*B. Not otherwise classified*

¶ 31. We have already concluded West Capitol's property was not nonproductive as of January 1, 2009. Consequently, the property did not meet the statutory definition of undeveloped, and West Capitol was not entitled to a fifty-percent reduction in the 2009 assessment. However, even if the property did qualify as nonproductive, we would nevertheless conclude it was not undeveloped because undeveloped property must also be "not otherwise classified under [WIS. STAT. § 70.32(2)]." *See* WIS. STAT. § 70.32(2)(c)4. West Capitol has not established its property was "not otherwise classified" on January 1, 2009.

¶ 32. Walker classified West Capitol's property as residential in 2009. Pursuant to WIS. STAT. § 70.32(2)(c)3., the residential class "includes any parcel or part of a parcel of untilled land that is not suitable for the production of row crops, on which a dwelling or other form of human abode is located and which is not otherwise classified under [§ 70.32(2)]." West Capitol argues this definition unambiguously excludes property not containing a dwelling from the residential class. Because West Capitol's property did not contain a dwelling as of January 1, 2009, West Capitol argues it could not have been classified as residential.

"land that is producing or is capable of producing commercial forest products," provided certain other conditions are met. Thus, for two of the eight statutory property classifications, the legislature has specifically directed municipal assessors to consider the property's future use. This strongly supports our conclusion that WIS. STAT. § 70.10 does not require property to be classified based on its actual use on January 1 of the assessment year.

¶ 33. We disagree. When subdivision (2)(c)3. is read in context with the rest of WIS. STAT. § 70.32(2)(c), it is clear the residential class is not restricted to the type of property described in that subdivision. Subdivision (2)(c)3. merely states that the residential class "*includes* any parcel or part of a parcel of untilled land that is not suitable for the production of row crops, on which a dwelling or other form of human abode is located and which is not otherwise classified under this subsection." (Emphasis added.) Every other subdivision of § 70.32(2)(c) uses the verb "means" instead of "includes" when defining a property classification. *See, e.g.,* § 70.32(2)(c)1d. (" 'Agricultural forest land' means . . ."); § 70.32(2)(c)1g. (" 'Agricultural land' means . . ."); § 70.32(2)(c)2. (" 'Productive forest land' means . . ."). The verb "means" clearly limits the classes of property defined in those subdivisions to the specific types of property described therein. If the legislature intended the residential class to be restricted to the type of property described in subdivision (2)(c)3., it would have used the verb "means," as it did in every other subdivision of § 70.32(2)(c), instead of "includes."[8] *See Graziano v. Town of Long Lake*, 191 Wis. 2d 812, 822, 530 N.W.2d 55 (Ct. App. 1995) ("[W]here the

---

[8] Our interpretation of WIS. STAT. § 70.32(2)(c)3. is consistent with the Department of Revenue's position. In a 2007 memorandum to municipal assessors, which was introduced into evidence at trial, the Department explained:

[WISCONSIN STAT. § 70.32] defines residential with the term includes versus the term means, which is seen within the remaining real property classification definitions. The use of the term includes implies that the residential class is not limited to the specific statutory definition. The application of the residential classification is therefore not limited to only those parcels with a dwelling or other form of human abode. This is significantly different than the term means, which is a word of limitation.

legislature uses similar but different terms in a statute, particularly within the same section, we may presume it intended the terms to have different meanings.").

¶ 34. West Capitol contends this interpretation produces an absurd result because, "[u]nder this logic, any untilled land not suitable for row crops—such as a cemetery or a parking lot—could be classified as 'Residential.'" However, simply because the residential class is not limited to the type of property described in WIS. STAT. § 70.32(2)(c)3. does not mean it includes all untilled land not suitable for the production of row crops. Aside from the property specifically described in § 70.32(2)(c)3., any other property included in the residential class must fall within the ordinary meaning of the term "residential." *See Kalal*, 271 Wis. 2d 633, ¶ 45.[9]

¶ 35. Moreover, WIS. STAT. § 70.32(1) directs assessors to value property "in the manner specified in the Wisconsin property assessment manual[.]" As relevant here, the Manual states:

> The residential class includes any parcel or part of a parcel of untilled land that is not suitable for the production of row crops, on which a dwelling or other form of human abode is located. *It also includes vacant land in cities and villages where the most likely use would be for residential development.*

WISCONSIN PROPERTY ASSESSMENT MANUAL 5–41 (Rev. 12/08). Thus, pursuant to the Manual, a vacant property may be classified as residential if it is most likely to

---

[9] In addition, we note that cemeteries are exempt from property taxation. *See* WIS. STAT. § 70.11(13). Further, parking lots would likely fall under the commercial classification. *See* WIS. STAT. § 70.32(2)(a)2.; WISCONSIN PROPERTY ASSESSMENT MANUAL 5–41 (Rev. 12/08) (The commercial classification includes land devoted to "providing . . . services in support of residential, agricultural, manufacturing, and forest uses.").

be used for residential development. The Manual sets forth the following factors an assessor should consider in making this determination:

- Are the actions of the owner(s) consistent with an intent for residential use?

- Is the size of the parcel typical of residential or developing residential parcels in the area?

- Is the parcel zoned residential or is residential zoning likely to be allowed?

- Is the parcel located in a residential plat, subdivision, CSM or near other residential development?

- Does the parcel's topography or physical features allow for residential use?

- Is the parcel located in an urban or rapidly changing to urban area, as contrasted with a location distant from much residential activity[?]

- Are there any other factors affecting the parcel which would indicate residential use is reasonably likely or imminent[?]

WISCONSIN PROPERTY ASSESSMENT MANUAL 8–1 (Rev. 12/08).

¶ 36. West Capitol contends that we should not consider the Manual's guidelines on classification of residential property for three reasons. First, West Capitol argues that, by allowing for classification of vacant land based on its most likely use, the Manual conflicts with WIS. STAT. § 70.10, which requires that property be assessed as of January 1 of the assessment year. West Capitol correctly observes that, when the Manual conflicts with a statute, the statute controls. *See Metropolitan Holding Co. v. Board of Review*, 173 Wis. 2d 626,

632–33, 495 N.W.2d 314 (1993); *Nestle USA, Inc. v. DOR*, 2011 WI 4, ¶ 26, 331 Wis. 2d 256, 795 N.W.2d 46. However, we do not perceive any conflict between the Manual and § 70.10. Nothing in § 70.10 prevents an assessor from considering a property's most likely use. The relevant inquiry is whether, as of January 1 of the assessment year, the property was most likely to be used for residential development.

¶ 37. Second, West Capitol notes that Wis. Stat. § 70.32(1) requires assessors to comply with the Manual only with respect to the *valuation* of real property. West Capitol therefore argues the Manual's guidelines are not controlling as to the *classification* of real property. However, our supreme court recently relied on the Manual in a case involving property classification. *See Sausen v. Town of Black Creek Bd. of Review*, 2014 WI 9, ¶ 3 n.4, ¶ 43, 352 Wis. 2d 576, 843 N.W.2d 39. We therefore reject West Capitol's argument that the Manual's guidelines on property classification are not controlling.

¶ 38. Third, West Capitol argues the Department of Revenue has no authority to promulgate guidelines for the classification of residential property. Wisconsin Stat. § 73.03(2a), which directs the Department to prepare and publish assessment manuals, states, "The manual shall discuss and illustrate accepted assessment methods, techniques and practices with a view to more nearly uniform and more consistent assessments of property at the local level. . . . *The manual shall include guidelines for classifying land as agricultural land[.]*" (Emphasis added.) Because § 73.03(2a) refers only to guidelines for classifying land as agricultural, West Capitol argues the Department has no authority to establish guidelines for the other seven statutory classes. We disagree. That the legislature specifically

directed the Department to promulgate guidelines for the classification of agricultural land does not mean the Department is prohibited from providing guidance regarding the other classes.

¶ 39. Having rejected West Capitol's arguments that the Manual's guidelines on classification of residential property do not apply, we now consider whether, as required by the Manual, residential development was the most likely use of West Capitol's property on January 1, 2009. Walker classified the property as residential, and West Capitol has the burden to prove that classification was erroneous. *See Sausen,* 352 Wis. 2d 576, ¶ 37. We conclude West Capitol has failed to meet its burden.

¶ 40. West Capitol argues residential development could not have been the most likely use of its property on January 1, 2009, because the property was zoned "B-1 general business district." West Capitol asserts, "Residential use is not a permitted use in the General Business District; the only type of home that is a permitted use in the General Business district is a funeral home." This argument fails for two reasons.

¶ 41. First, when deciding whether to classify vacant property as residential, the Manual directs assessors to consider whether the property is currently zoned residential or whether "residential zoning [is] likely to be allowed[.]" WISCONSIN PROPERTY ASSESSMENT MANUAL 8–1 (Rev. 12/08). Thus, a property need not be zoned residential in order to be classified as residential for property tax purposes, as long as residential use is likely to be allowed. Walker testified without contradiction that it would not be difficult to obtain permission to build a residence on West Capitol's property.

¶ 42. Second, West Capitol's assertion that residential use is not permitted under the property's current zoning appears incorrect. The Village's zoning code lists "[s]ingle family housing as of January 1, 2007" as a permitted use in the B-1 general business district. SISTER BAY, WIS., ZONING CODE § 66.0320(a)(63). Residential condominiums are listed as a conditional use. SISTER BAY, WIS., ZONING CODE § 66.0320(c)(9). Thus, the property's B-1 zoning designation does not appear to prohibit residential use.

¶ 43. West Capitol next argues residential development could not have been the most likely use of the property on January 1, 2009, because West Capitol has no intent to develop the property. At trial, West Capitol's principal shareholder testified West Capitol purchased the property in the late 1960s, it has never made any improvements to the property, and it intends to keep the property in its natural state. However, West Capitol does not cite any authority for the proposition that an owner's subjective expressions of intent are dispositive of a property's most likely use. We acknowledge the Manual directs assessors to consider whether the property owner's "actions" are "consistent with an intent for residential use[.]" WISCONSIN PROPERTY ASSESSMENT MANUAL 8–1 (Rev. 12/08). Nevertheless, that factor is only one of seven factors the Manual directs assessors to consider. *See id.* West Capitol does not explain why consideration of all seven factors demonstrates Walker improperly classified the property as residential.

¶ 44. Finally, West Capitol argues the residential classification must have been improper in 2009 because Walker reclassified the property as commercial in 2012. We are not convinced. Walker testified he believed the property's highest, best, and most likely use was a development "with a combination of commercial and

154

residential improvements." This suggests either a residential or commercial classification would have been appropriate. Further, Walker testified he reclassified the property in 2012 in response to assertions West Capitol made during the Board of Review proceedings. That Walker changed the classification to commercial after receiving additional information from West Capitol does not necessarily mean the original residential classification was erroneous.[10]

¶ 45. We therefore reject West Capitol's argument that its property was "not otherwise classified" as of January 1, 2009. *See* Wis. Stat. § 70.32(2)(c)4. West Capitol had the burden to prove that Walker improperly classified the property as residential, and it failed to meet that burden. Accordingly, the property did not qualify as "undeveloped," and the circuit court properly determined West Capitol was not entitled to a fifty-percent reduction in the 2009 assessment.

## II. Assessed value for the year 2009

¶ 46. The circuit court concluded the 2009 assessment of West Capitol's property was excessive. It there-

[10] Moreover, Walker's reclassification of the property as commercial in 2012 demonstrates, at most, that the property should have been classified as commercial in 2009. However, if the property had been classified as commercial in 2009, it would not have qualified as undeveloped, and West Capitol would not have been entitled to a fifty-percent reduction in the property's assessment. *See* Wis. Stat. § 70.32(2)(c)4. (Undeveloped land includes "other nonproductive lands *not otherwise classified under this subsection*."). West Capitol makes no argument on appeal that a commercial classification would have been improper in 2009. The Wisconsin Property Assessment Manual states the commercial classification includes "vacant land . . . for which the most likely use is commercial." Wisconsin Property Assessment Manual 9–1 (Rev. 12/08).

fore reduced the assessment to $3,935,000—the same amount as the 2010 assessment. West Capitol argues the court should have instead adopted Rentmeester's valuation—$2,602,000. Alternatively, West Capitol argues the court should have ordered a reassessment.

¶ 47. In proceedings on an excessive assessment claim, the assessor's assessment is entitled to a presumption of correctness. *Allright Props., Inc. v. City of Milwaukee*, 2009 WI App 46, ¶ 12, 317 Wis. 2d 228, 767 N.W.2d 567; *see also* WIS. STAT. § 70.49(2). The taxpayer may overcome this presumption in two ways: (1) by presenting significant contrary evidence; or (2) by showing the assessor failed to apply the principles set forth in the Wisconsin Property Assessment Manual. *Allright Props.*, 317 Wis. 2d 228, ¶ 12. Here, the circuit court determined the 2009 assessment was excessive because it was not "pursuant to law or the Wisconsin Property Assessment Manual." However, the court rejected West Capitol's argument that Rentmeester's appraisal was significant contrary evidence of the property's value. The court specifically found that Rentmeester's appraisal was not reliable or accurate.

¶ 48. The circuit court's finding that Rentmeester's appraisal was not reliable or accurate is amply supported by evidence in record and is not clearly erroneous. *See* WIS. STAT. § 805.17(2) ("Findings of fact shall not be set aside unless clearly erroneous[.]"); *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶ 39, 319 Wis. 2d 1, 768 N.W.2d 615 (A finding of fact is clearly erroneous when it is against the great weight and clear preponderance of the evidence.). The court gave three specific reasons for rejecting Rentmeester's appraisal: (1) Rentmeester was not certified as a commer-

156

cial appraiser; (2) Rentmeester defined the neighborhood of the subject premises too broadly; and (3) Rentmeester's comparables differed from West Capitol's property in several important respects. The record supports the circuit court's reasons.

¶ 49. Moreover, on appeal, West Capitol has failed to address the circuit court's reasons for rejecting Rentmeester's appraisal. Failure to address the grounds on which the circuit court ruled constitutes a concession of the ruling's validity. *Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994). This is "especially true" where, as here, "the respondent raises the grounds relied upon by the trial court, and the appellant fails to dispute these grounds in a reply brief." *See id.* We therefore reject West Capitol's argument that the circuit court erred by refusing to adopt Rentmeester's valuation.

¶ 50. In the alternative, West Capitol argues the court erred by proceeding to judgment without ordering a reassessment. When a circuit court determines an assessment was excessive, "the court, before entering judgment, shall continue the action to permit reassessment of the property." WIS. STAT. § 74.39(1). The only exception to this requirement is set forth in WIS. STAT. § 74.39(3), which states:

> EXCEPTION. The court may proceed to judgment without ordering a reassessment under sub. (1), if the court finds that to do so is in the best interests of all parties to the action and if the court is able to determine the amount of unlawful taxes with reasonable certainty.

¶ 51. Whether to proceed to judgment without ordering a reassessment appears to be committed to the

157

circuit court's discretion. *See* Wis. Stat. § 74.39(3) (court "*may* proceed to judgment without ordering a reassessment" if certain criteria are met (emphasis added)); *Kotecki & Radtke, S.C. v. Johnson*, 192 Wis. 2d 429, 447–48, 531 N.W.2d 606 (Ct. App. 1995) (In a statute, the word "may" typically indicates a grant of discretion.). We will not reverse a circuit court's discretionary decision unless the court erroneously exercised its discretion. *State v. Mayhall*, 195 Wis. 2d 53, 64–65, 535 N.W.2d 473 (Ct. App. 1995). A court erroneously exercises its discretion by making an error of law or failing to base its decision on the facts of record. *Bethke v. Auto-Owners Ins. Co.*, 2013 WI 16, ¶ 16, 345 Wis. 2d 533, 825 N.W.2d 482. When reviewing a discretionary decision, we accept the circuit court's factual findings unless they are clearly erroneous, but we independently review any questions of law. *Monicken v. Monicken*, 226 Wis. 2d 119, 125, 593 N.W.2d 509 (Ct. App. 1999).

¶ 52. We agree with West Capitol that the circuit court erroneously exercised its discretion by proceeding to judgment without ordering a reassessment. When a court finds an assessment excessive, it must order a reassessment unless it finds that: (1) proceeding to judgment is in the parties' best interests; and (2) the court is able to determine the amount of unlawful taxes with reasonable certainty. Wis. Stat. § 74.39(3). The circuit court made both of these findings. However, it completely failed to explain the reasoning behind its decision. When a circuit court fails to explain its reasoning, we may search the record to determine whether it supports the court's discretionary decision. *Randall v. Randall*, 2000 WI App 98, ¶ 7, 235 Wis. 2d 1, 612 N.W.2d 737. Here, there is little or no evidence in the record to support the circuit court's findings.

¶ 53. For instance, there is no evidence in the record as to whether proceeding to judgment without a reassessment was in the parties' best interests. There was no testimony at trial about any negative effects either party would suffer if the court ordered a reassessment. The Village did not develop any argument in its appellate brief that proceeding to judgment was in the parties' best interests. At oral argument, the Village suggested proceeding to judgment was in the parties' best interests because of the "dispute between the parties" and the "ongoing nature of the litigation." However, these considerations will likely be present in most excessive assessment cases. The legislature nevertheless prescribed reassessment as the default remedy for an excessive assessment.

¶ 54. In addition, West Capitol asserted in its reply brief that proceeding to judgment was not in the parties' best interests because the circuit court determined the amount of unlawful taxes based on the 2010 assessment, which was itself under review in separate litigation. The Village failed to respond to this contention at oral argument. It is difficult to discern how it could have been in the parties' best interests to calculate the unlawful taxes for 2009 using an assessment that was itself under review.

¶ 55. There is also little evidence in the record supporting the circuit court's finding that it could determine the amount of unlawful taxes for 2009 with reasonable certainty based on the 2010 assessment. In its written decision, the court concluded that "the appropriate valuation and assessment of [West Capitol's] property for 2009 should have been $3,935,000"—the same as in 2010. The court summarized Walker's testimony about the 2010 assessment, stating:

> Mr. Walker testified that for the 2010 assessment the 610 feet of shoreland frontage were assessed at $5,500 per shoreland foot. There was then a $2.00 per square foot assessment for the inland acreage (444,925 square feet). [Walker] applied a 35% adjustment to that assessment for a total of $580,000 for the inland acreage. When that amount was added to the shoreland assessment of $3,355,000, [West Capitol's] assessment was lowered to $3,935,000[.]

What the court failed to note is that Walker never explained how he reached the numbers he used to determine the 2010 assessment. There is no basis in the record to determine whether the $5,500 ISV and the thirty-five percent adjustment Walker used were appropriate. In addition, Walker did not explain whether the numbers he used to calculate the 2010 assessment would have been equally applicable to the property in 2009. Consequently, the circuit court's conclusion that the property's assessed value for 2009 should have been the same as in 2010 was speculative.[11]

¶ 56. As explained above, the record does not support the circuit court's findings that proceeding to judgment was in the parties' best interest and that the court could determine the amount of unlawful taxes for 2009 with reasonable certainty. As a result, the court erroneously exercised its discretion by proceeding to judgment based on the 2010 assessment. We therefore reverse in part and remand with directions that the court order a reassessment.

---

[11] Walker's failure to give a more in-depth explanation of the 2010 assessment is not particularly surprising. As West Capitol points out, "At trial, the court gave no indication that the 2009 assessment would be established [based on the 2010 assessment]." Walker himself asserted at trial that the 2010 assessment was not relevant to the 2009 assessment's validity.

¶ 57. Neither party shall receive appellate costs. *See* WIS. STAT. RULE 809.25(1).

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.