COURT OF APPEALS
DECISION
DATED AND FILED

November 6, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP335**

STATE OF WISCONSIN

Cir. Ct. No. 2024SC3767

IN COURT OF APPEALS
DISTRICT IV

SCOTT K. MATTHEWS,

   PLAINTIFF-RESPONDENT,

 V.

CITY OF MADISON,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dane County: ANN M. PEACOCK, Judge. *Affirmed*.

Before Graham, P.J., Blanchard, and Kloppenburg, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. The City of Madison appeals from a money judgment in favor of Scott Matthews entered by the circuit court in this small

claims case following a trial.[1] The court credited Matthews' claims that the City excessively assessed the value of his single-family residential property for purposes of collecting 2023 real estate taxes.

¶2 The City argues that the circuit court was not competent to hear Matthews' excessive assessment action using the procedures available for small claims under WIS. STAT. ch. 799. We reject this argument because the City has failed to ensure that there is an adequate record on appeal to allow us to review the court-competency issue.

¶3 The City further argues that the circuit court erred in concluding, based on the evidence presented during trial, that Matthews rebutted the presumption created by statute that the City's 2023 assessment of his property was correct. As part of this argument, the City contends that the court erred in crediting evidence presented by Matthews to reach a determination of a reliable value for the property that was lower than that assessed by the City. We conclude that Matthews met his burden to rebut the presumption of correctness, given factual findings made by the circuit court that the City does not show were clearly erroneous. We further reject the City's contention that the court should not have credited evidence presented by Matthews regarding a reliable value of his property. Therefore, Matthews' evidence supports the court's resolution of his excessive assessment claim in his favor.

---

[1] Pursuant to WIS. STAT. § 752.31(a) (2023-24), appeals for cases subject to the procedures in WIS. STAT. ch. 799 (2023-24), such as this one, are generally decided by one judge of this court. In this appeal, however, after reviewing the appellate briefs this court determined that it warrants consideration by three judges and the chief judge of this court ordered that it be so decided. *See* WIS. STAT. RULE 809.41(3) (2023-24).

All references to the Wisconsin Statutes are to the 2023-24 version.

¶4    The City also contends that the circuit court erroneously exercised its discretion by entering a judgment in Matthews' favor instead of allowing the City to reassess the value of his property. We reject this argument because the City failed to preserve the reassessment-related issue in the circuit court.

¶5    Accordingly, we affirm.

## BACKGROUND

¶6    For purposes of determining Matthews' property tax bill for tax year 2023, the City of Madison determined that his residential property had an assessed value of $1,081,100. Matthews submitted an objection to the City's Board of Review, contending that this was too high. *See* WIS. STAT. § 70.47(7) (describing procedure for tax objections submitted to municipal boards of review). An assessor for the City prepared a report for the board of review that recommended sustaining the original assessment.

¶7    In October 2024, the board voted to sustain the assessment. Matthews sought review by the City's common council, which rejected Matthews' claim. *See* WIS. STAT. § 74.37(3), (4)(a) (permitting commencement of excessive assessment claim only when claim is "disallowed," meaning that the claim is rejected, by the applicable taxation district, among other procedural requirements); *see also* WIS. STAT. § 70.045 (defining taxation districts to include cities, such as Madison, in which "general property taxes are levied and collected").

¶8 Relying on WIS. STAT. § 74.37(3)(d), Matthews commenced this action in the circuit court.[2] He did this by filing a summons and complaint form to initiate a small claims action, in which he alleged that the City had excessively assessed the value of his residential property. He alleged that he had paid his 2023 property taxes in full, that he had not received relief from the board of review, and that he is entitled to a refund of $2,579.09.

¶9 Matthews' complaint was dismissed by a circuit court commissioner, and Matthews sought de novo review in the circuit court. The City moved the court to dismiss Matthews' complaint for failure to state a claim on which relief could be granted under the procedures that apply in small claims actions established in WIS. STAT. ch. 799. The City briefly argued that, under the small claims procedures, the circuit court lacked competency to exercise jurisdiction over Matthews' excessive assessment action. On appeal, the parties do not dispute that the circuit court denied the City's motion. But the circuit court's ruling is not a part of the record. The clearest evidence of the court's denial of the City's motion is an abbreviated docket entry that can be interpreted to mean that the court denied the motion at a scheduling conference, but this docket entry does not reflect the content of any argument by a party or the reasoning of the court.

¶10 The circuit court held a small claims trial at which Matthews and several witnesses called by the City testified. Matthews did not dispute at trial that

---

[2] The procedures for claims of excessive assessments in property tax collection are established in WIS. STAT. § 74.37, which includes the right for a claimant to commence an action in the circuit court to attempt to recover the amount of the claim when the claim is not allowed by the taxation district. *See* § 74.37(3); *State ex rel. City of Waukesha v. City of Waukesha Bd. of Rev.*, 2021 WI 89, ¶17, 399 Wis. 2d 696, 967 N.W.2d 460 (explaining that pursing an action under § 74.37 is one of three options for property owners to appeal an adverse board of review decision).

the court should begin with the presumption that the City's assessment is correct, consistent with WIS. STAT. § 70.49(1)-(2) (affidavit of assessor regarding real property valuation properly included with taxation district's assessment roll is "presumptive evidence" that pertinent properties have been justly and equitably assessed). The court ruled that Matthews overcame the presumption. The court further found that Matthews had accurately determined the value of his property for the 2023 tax year to be $940,000. Accordingly, the court granted Matthews a judgment of $2,579.09, which the court determined represented the amount that he was excessively taxed based on the City's higher assessment.

¶11    The City appeals.

## DISCUSSION

¶12    We begin by clarifying that Matthews' claim is not in the form of a certiorari challenge to the actions or decisions of the office of the city assessor, the board of review, or the city council. Instead, it is an excessive assessment claim under WIS. STAT. § 74.37. *See, e.g.*, **Regency W. Apartments LLC v. City of Racine**, 2016 WI 99, ¶21, 372 Wis. 2d 282, 888 N.W.2d 611 (appeals of excessive assessment actions in the circuit court involve the review of the trial record created in circuit court, not of a certiorari record of prior proceedings). With that clarification, we address the three issues that the City raises in this appeal.

## I. Inadequate Record Regarding the Court Competency Issue

¶13    The City argues that the circuit court lacked "competency to entertain an excessive assessment claim under WIS. STAT. § 74.37(3) using the procedures for small claims actions" contained in WIS. STAT. ch. 799. We reject this argument based on the City's failure, as the appellant, to ensure that this court

5

has a complete record regarding the issue. We could only speculate about how the issue was developed in the circuit court, including which arguments now made by the City are preserved for appeal. In particular, as noted above, the parties' arguments in the circuit court on this issue are not fully reflected in the record on appeal and the reason or reasons that the circuit court gave for denying the City's motion are not at all reflected in the record. These omissions are dispositive in resolving the competency issue.

¶14 The City's motion to dismiss in the circuit court referred to the concept that the court was not competent, but the City made only a cursory assertion on this topic. The assertion was that a circuit court using small claims procedure under WIS. STAT. ch. 799 "lack[s] the competency to fully proceed under [WIS. STAT. chs.] 70 and 74." The City's argument consisted of one paragraph of isolated references to aspects of pertinent procedures in ch. 799 (addressing how circuit courts are to handle trials de novo) and ch. 74 (addressing how circuit courts are to handle excessive assessment actions), without explaining how the ch. 799 procedures are incompatible with the ch. 74 procedures. A few points on this topic were included in a letter from counsel for the City to the court, although the added points were not robustly developed. It is unclear from the record what, if any, additional arguments either of the parties made to the circuit court at the proceeding at which the court denied the City's motion. Given these circumstances, we are not confident that we have a full picture of what either party argued on this issue, and we lack any idea of what the court's reasoning was.

¶15 "'It is the appellant's responsibility to ensure completion of the appellate record and when an appellate record is incomplete in connection with an issue raised by the appellant, we must assume that the missing material supports the [circuit] court's ruling.'" *Gaethke v. Pozder*, 2017 WI App 38, ¶36, 376

Wis. 2d 448, 899 N.W.2d 381 (quoting *State v. McAttee*, 2001 WI App 262, ¶5 n.1, 248 Wis. 2d 865, 637 N.W.2d 774). It is true that the circuit court's ruling appears to have been rendered during a scheduling conference, and pertinent supreme court rules do not require the creation of transcripts for scheduling conferences. *See* SCR 71.01(2)(b), 71.04. Yet that was no impediment to the City taking whatever steps it needed to take in order to ensure a record that reflects the circuit court's reasoning on this issue, nor does the City now address the complete absence of any such record. This was the City's responsibility if it wanted to pursue it on appeal in the event that the City did not prevail in the circuit court.

¶16 It is also true that we review issues of circuit court competency de novo, *see City of Eau Claire v. Booth*, 2016 WI 65, ¶6, 370 Wis. 2d 595, 882 N.W.2d 738, but under these circumstances we could at best merely speculate as to how the competency issue was developed and resolved in the circuit court. For example, we are not able to determine whether any or all of the City's arguments on appeal regarding this issue were sufficiently developed in the circuit court and thus preserved for review on appeal. *See id.*, ¶1 (challenges to a circuit court's competency to exercise its jurisdiction can be forfeited by a failure to timely raise the issue). To cite one topic that may not have been preserved, the City now argues that the existence of "charge back" procedures under WIS. STAT. § 74.41, which are applicable when a taxation district is ordered by a circuit court to pay back to a taxpayer an excessive tax, demonstrate that WIS. STAT. § 74.37 actions are incompatible with small claims procedure, but this point does not appear in

any filing in the circuit court.[3]  For these reasons, we reject the City's argument about competency here.  *See Gaethke*, 376 Wis. 2d 448, ¶36; *see also Local 2489, AFSCME v. Rock County*, 2004 WI App 210, ¶¶7, 29 n.8, 277 Wis. 2d 208, 689 N.W.2d 644 (noting the assumption that missing material can support the circuit court's ruling, in the context of discussing an issue that is reviewed de novo on appeal).

## II.  Presumption of Correctness and Valuation of Matthews' Property

¶17  In directly challenging the merits of the circuit court's ruling granting a money judgment to Matthews, the City argues that the court erred in concluding that Matthews overcame the presumption of correctness that attached to the City's assessment.  Further, the City contends that, even if Matthews overcame the presumption, the court lacked a sufficient basis to assess the property at $940,000 for the tax year 2023.  We provide an overview of pertinent legal standards, then additional background from the small claims trial.  After that, we explain our conclusions that, given the findings of the circuit court, Matthews rebutted the presumption and provided sufficient evidence for the court to determine that the value of his residence was $940,000.

---

[3] We now briefly explain the "charge back" concept for context.  The City's argument is based on procedures outlined in WIS. STAT. § 74.41, under which the Wisconsin Department of Revenue helps tax districts, such as the City, recoup ("charge back") portions of excessive tax refunded to taxpayers as a result of, as pertinent here, WIS. STAT. § 74.37 actions from "tax jurisdictions" that initially received the excess-tax revenue.  *See* § 71.41(1)(c), (4)-(5); WIS. STAT. § 74.01(7) (defining "tax jurisdiction" as "any entity authorized by law to levy taxes on general property which is located within its boundaries," for example, a school district).

### A. Legal Standards

¶18    In the context of an excessive assessment action, "[v]aluation of real estate for tax assessment purposes is governed by WIS. STAT. § 70.32." *Lowe's Home Centers, LLC v. City of Delavan*, 2023 WI 8, ¶27, 405 Wis. 2d 616, 985 N.W.2d 69.  Section 70.32 states that the taxable value of residential property is based on its market value.  Depending on the particular circumstances, one or more of the three distinct "tiers" of assessment methods that are provided for in § 70.32(1) are used to estimate the market value of a piece of real property for assessment purposes.  *Lowe's Home Centers*, 405 Wis. 2d 616, ¶28.  Tier 1, which provides "the best" indicator of a property's fair market value, is an arm's-length sale of the subject property itself.  *See id.*, ¶29.  Here, there is no dispute that no such sale was available for analysis.  In such cases, "the appraiser moves to a tier 2 analysis, examining recent arm's-length sales of reasonably comparable properties," which is known as the "sales comparison" approach.  *See id.*  There is no dispute that tier 2 analysis applies here.[4]

¶19    As noted, there is no dispute that the City's challenged valuation of Matthews' property enjoys the presumption of correctness under WIS. STAT. § 70.49(2).    A taxpayer challenging an assessment that is subject to the presumption bears the burden of rebutting it, and when the taxpayer fails to do so

---

[4] We need not refer to the nature of "tier 3" analysis because there is no dispute that it was not applicable here.  Tier 3 is resorted to only "when both tier 1 and tier 2 are unavailable," *see Lowe's Home Centers, LLC v. City of Delavan*, 2023 WI 8, ¶30, 405 Wis. 2d 616, 985 N.W.2d 69, or to "verify" that an assessment under tier 2 is not excessive, *see Marathon Petroleum Co. LP v. City of Milwaukee*, 2018 WI App 22, ¶68, 381 Wis. 2d 180, 912 N.W.2d 117.  Both parties here sought to establish the value of Matthews' property based on recent sales of what they argued were comparable properties (albeit different purported comparable sales), and the City did not attempt to rely on tier 3 analysis to show that the assessment was not excessive.

the circuit court must uphold the assessment. *See **Bonstores Realty One, LLC v. City of Wauwatosa***, 2013 WI App 131, ¶10, 351 Wis. 2d 439, 839 N.W.2d 893 (failure to rebut presumption of correctness entitled taxing city to judgment based on the presumption).

¶20     A taxpayer rebuts the presumption of correctness through proof that the assessor did not "correctly apply" the Wisconsin Property Assessment Manual or the Wisconsin statutes, or through the presentation of "significant contrary evidence" to the evidence relied on by the assessor. ***Lowe's Home Centers***, 405 Wis. 2d 616, ¶32.[5]  "If … the failure to follow the Manual results in an excessive assessment, then the presumption is overcome and the assessment must be set aside." *See **id.***, ¶37.

¶21     We review de novo whether the City's valuation complied with the Manual and the statutes. *See **Veritas Vill., LLC v. City of Madison***, 2023 WI App 56, ¶17, 409 Wis. 2d 572, 998 N.W.2d 506, *review denied*, 2024 WI 33, 9 N.W.3d 276; ***Metropolitan Assocs. v. City of Milwaukee***, 2018 WI 4, ¶24, 379 Wis. 2d 141, 905 N.W.2d 784.  In contrast, we "defer to the circuit court's findings of fact and 'will not upset the court's factual findings, including findings involving the credibility of witnesses, unless they are clearly erroneous.'"  ***Veritas Vill.***, 409 Wis. 2d 572, ¶17 (quoted source omitted); ***Metropolitan Assocs.***, 379 Wis. 2d 141, ¶25.  "'In particular, it is within the province of the factfinder to determine the

---

[5] We sometimes refer to the Wisconsin Property Assessment Manual as "the Manual" and cite to it as **WPAM**.  The Manual states that it is intended to serve "as the guide for uniform property assessment throughout" Wisconsin.  **WPAM**, Introduction (2023); *see also* WIS. STAT. § 73.03(2a) (granting state department of revenue duty and power to create the Manual); WIS. STAT. § 73.32(1) (requiring real property assessors to value property "in the manner specified in the Wisconsin property assessment manual").

weight and credibility of expert witnesses' opinions.'" ***Veritas Vill.***, 409 Wis. 2d 572, ¶17 (quoted source omitted); *see also **Adams Outdoor Advert., Ltd. v. City of Madison***, 2006 WI 104, ¶27, 294 Wis. 2d 441, 717 N.W.2d 803 (When the fact finder is presented with "conflicting testimony the fact finder is the ultimate arbiter of credibility" and the weight and credibility given to expert opinions is "'uniquely within the province of the fact finder.'" (quoted source omitted)).

¶22 The Manual instructs that, when using the tier 2 approach at issue in this case, the assessor identifies recently sold properties that are reasonably comparable to the subject property, and then makes "adjustments" to the value of each comparable property based on differences between each comparable property and the subject property, based on how certain attributes of the comparable properties contribute more or less to their value relative to the subject property. ***WPAM*** at § 9, pp. 24, 27, § 12, p. 6; *see, e.g.*, ***Lowe's Home Centers***, 405 Wis. 2d 616, ¶67. For example, if a reasonably comparable property has three bathrooms and the subject property only has two, the assessor adjusts the value of the comparable property downward to account for the market value of the additional bathroom. *See **WPAM*** at § 9, p. 27, § 12, p. 6 ("all adjustments are made to the sale price of the comparable [property] to indicate the value of the subject" property). Once all necessary adjustments are made, the assessor determines which of the comparable properties are most comparable to the subject property and then uses the adjusted values of those sales to estimate the value of the subject property. ***Id.*** at § 9, pp. 27-28, § 12, pp. 8-9, 23-24.

¶23 The Manual provides a list of "basic elements of comparison." ***Id.*** at § 9, p. 26. These are property attributes that should be considered as potential bases for adjustments. As pertinent here, and not surprisingly, one such basic element of comparison is the location of a comparable property compared to the

location of the subject property. *Id.* at § 9, pp. 26-27 ("adjustments should be made to reflect differences in value resulting from the location of property"). The Manual gives examples of different kinds of location-based reasons for adjustments. Most pertinent here, "the price of a home in one area may be higher than that of a similar home in another area because buyers view one location as more desirable than another." *Id.* at § 9, p. 27. The Manual's emphasis on the relevance of property locations is echoed in the Manual's more general guidance regarding property valuation, outside of the Manual's specific discussion of the tier 2 approach. The Manual lists "physical factors" that are applicable in assessing properties individually or en masse, the most important of which is "location." *Id.* at § 9, pp. 13-14. Similarly, in the context of valuing land specifically, as opposed to improvements on the land, the Manual states that location is "a primary factor in the value of any particular property," meaning the value of the property as a whole. *Id.* at § 9, p. 18.

### B. Additional Background

¶24 Matthews testified at the trial as follows. Matthews worked for the City's assessor's office for about 20 years, the last several as the City's "lead residential appraiser," before leaving the assessor's office in 2019. Matthews conducted a sales-comparison analysis for his own residential property for the tax year 2023 that relied on the sales of properties that Matthews considered to be reasonably comparable to his own. In doing so, Matthews relied on sales of different properties from those relied on by the City in its assessment. Based on this analysis, Matthews estimated the fair market value of his property to be $940,000.

¶25    Matthews arrived at this number based in relevant part on the following reasoning.[6]  His property was unique for its neighborhood ("assessment area 2"), and therefore he considered residential property sales that occurred outside of his neighborhood which might be reasonably comparable to the value of his property.    Matthews identified five sales of residential properties in "assessment area 100," which is the Hawk's Landing neighborhood, on the ground that the Hawk's Landing sales represented sales of properties more similar in quality and size to his property than those in his own assessment area 2.  The City, like Matthews, looked outside assessment area 2 in order to identify the sales of five homes that were more similar to Matthews' property in quality and size.  However, four sales relied on by the City occurred in "assessment area 110," which is the Blackhawk neighborhood, and the City relied on only one sale from Hawk's Landing.[7]

¶26    Matthews testified that he derived an adjustment of seven percent that should be used when evaluating the value differences between his chosen comparable sales properties in Hawk's Landing and his property in assessment area 2.  He testified that this seven percent adjustment was based on the market

---

[6] Matthews presented to the circuit court at trial what he contended was a proper comparative sales analysis based on the Manual's principles and Matthews' experience.  This analysis included numerous adjustments made to the comparable sales, including for the lot size, year of construction, and home size.  The City on appeal does not clearly develop arguments challenging the accuracy or reliability of numerous of Matthews' adjustments; the only challenges by the City that we are able to discern are addressed further below in the text.

[7] For ease of reference and following the lead of the parties at trial and on appeal, we refer to the City's tax assessment area 100 as the Hawk's Landing neighborhood and to the City's area 110 as the Blackhawk neighborhood.  The parties and the circuit court treated the relevant boundaries as well-defined and not in dispute.  As for the area in which Matthews' property is located, neither the parties nor the evidence presented at trial identified a similar neighborhood-type reference and therefore we refer to that as "assessment area 2."

13

valuing the location of Hawk's Landing more highly than his assessment area 2. Matthews testified that he derived this percentage through the following method: for each piece of property in his own neighborhood, assessment area 2, adding up the values specific to parcels of land, not including the values of the associated improvements on the parcels; dividing that number by the total land area for assessment area 2; and then comparing that to the analogous ratio for Hawk's Landing (assessment area 100).

¶27    Regarding the City's assessment, Matthews interpreted the City's assessor to have failed to make any location-based adjustments for any of the City's five purported comparable sales—that is, adjustments based on the comparable properties being located in a different neighborhood from Matthews' neighborhood. While aspects of Matthews' presentation at trial are not entirely clear to us, the circuit court had a reasonable basis to interpret him to argue the following. There was evidence showing that the City's approach was flawed for at least the reason that it failed to make location-based adjustments that reflected a "premium"—namely, the desire of property buyers, as reflected in sales prices, for properties located in the Blackhawk neighborhood over their desire for properties in the Hawk's Landing neighborhood and properties in his own assessment area 2. Thus, according to Matthews, although the Blackhawk housing and the Hawk's Landing housing was generally similar in nature, the market for Hawk's Landing properties was more comparable to the market for assessment area 2 properties than the Blackhawk market was comparable to the assessment area 2 market. Put differently, Matthews argued that Blackhawk's location was substantially more valuable than the location of Hawk's Landing, which Matthews contended in turn was more highly valued than the location of assessment area 2. As a result, Matthews contended that the City should not have relied on Blackhawk properties

for comparable sales—at least not without making significant adjustments based on location—but instead should have relied on sales in Hawk's Landing.

¶28 In support of Matthews' proposition that the market placed a premium on Blackhawk properties over Hawk's Landing properties, Matthews used three types of calculations to derive three estimates of the premium, ranging from approximately 22% to 28%. One calculation was based on the sales of vacant lots in the two neighborhoods in 2000 and 2001, and two others were based on the sales of two-story residences from the two neighborhoods in 2023.

¶29 Matthews attributed the Blackhawk-over-Hawk's Landing premium to the fact that Blackhawk's residences (where the City's primary comparable sales were) were served by a school district that tended to be more desirable to buyers than the school district serving Hawk's Landing (Matthews' sole comparison area), which was also the district that served assessment area 2. Specifically, Matthews gave unrebutted testimony that students in both his assessment area 2 and in the Hawk's Landing neighborhood all attend the same middle and high schools, which are in the Madison school district, while Blackhawk is "primarily" part of the Middleton-Cross Plains school district. In sum, Matthews could reasonably be understood to contend that the City's assessment was flawed in primarily relying on purportedly comparable sales in the Blackhawk neighborhood, without making adjustments due to location-based differences in value that Matthews attributed to the fact that Blackhawk and Hawk's Landing were not served by the same school district. This was especially so, according to Matthews, given that similarly comparable sales were available for analysis from the Hawk's Landing neighborhood that were served by the same school district as Matthews' own neighborhood of assessment area 2.

15

¶30    The City called three witnesses, each with experience and training regarding the valuation of property for tax purposes, including the application of principles described in the Manual.  These three witnesses were: a former state department of revenue employee who currently serves as a business systems manager for the City's assessor's office; the supervisor of the City's residential assessment team, who sat on the board of review that rejected Matthews' objection to his assessment; and the assessor who prepared the City's comparable sales analysis underlying the City's assessment of Matthews' property.  Summarizing broadly, these witnesses testified about how the City assesses property generally and also identified what they contended were weaknesses in Matthews' comparative sales analysis and his calculations of a location-based premium for Blackhawk over Hawk's Landing.

¶31    The circuit court made the following findings.  Matthews' property is unique within assessment area 2, and therefore a tier 2 analysis must necessarily involve reasonably comparable sales that occurred in one or more neighborhoods other than assessment area 2.  Matthews identified sufficient evidence to show that Blackhawk had "significant[ly]" higher land values than did both Hawk's Landing and assessment area 2.[8]  These significantly higher values were prevalent, whether or not the disparity was due to the different school districts that serve the two neighborhoods or due to other factors.  The court further found that the City had failed to take location into account in its assessment process.

---

[8] To be more precise, in making this finding the circuit court explicitly referred to "the subject property," and not to assessment area 2 more generally.  But we interpret the court to have meant that Matthews had provided evidence that Blackhawk had significantly higher land values than both Hawk's Landing and assessment area 2 generally.

¶32 Based on these findings, the circuit court determined that, in assessing Matthews' property, the City failed to properly apply the principles of the Manual, and that therefore Matthews rebutted the presumption of correctness. The court went on to find that the property should be valued according to Matthews' valuation of $940,000. The court found that Matthews' methodology was better than that of the City in valuing the property because Matthews adjusted for location in his analysis and the City had not.

### C. Rebuttal of Presumption Due to Failure to Follow Manual

¶33 We conclude that the City fails to show that the circuit court's findings of fact were clearly erroneous. Further, we conclude that these findings provided a reasonable basis for the court to determine that Matthews overcame the presumption of correctness based on the proposition that the City's comparative sales analysis did not properly account for the location of Matthews' residence and the locations of reasonably comparable sales as reflected in the difference in land values between pertinent neighborhoods. This reasonably supported a conclusion that the City did not follow the Manual's direction to account for location as a key valuation component. *See WPAM* at § 9, pp. 14, 18, 26-27; *see also Lowe's Home Centers*, 405 Wis. 2d 616, ¶32 (taxpayer rebuts presumption of correctness by showing that assessor "did not correctly apply" the Manual).

¶34 One key feature of the circuit court's apparent reasoning involved the following determinations. The disparity in land values between Blackhawk, on the one hand, and both Hawk's Landing and assessment area 2, on the other hand, provided significant evidence that the market valued Blackhawk's location more highly than either Hawk's Landing or assessment area 2. Despite that, the City failed to either make adjustments based on this land-value disparity for the

17

City's Blackhawk-based comparable sales or else explain—in a way that the court found credible—why such adjustments were not necessary. In other words, the court's core analysis was that the City failed to properly determine, as it should have, whether location-based adjustments were necessary.

¶35 The City does not argue on appeal that its assessment of Matthews' property included adjustments based on the differences in land values between Matthews' neighborhood and the areas in which the City's comparable sales occurred. Nor does the City dispute that the Manual instructs assessors to consider locations of properties as potential bases for making adjustments in a comparative sales analysis.

¶36 Instead, the City argues that the trial evidence establishes that it considered whether to make location-based adjustments and properly determined that no location-based adjustment was necessary for its four Blackhawk comparable sales. The City further contends that the circuit court clearly erred in finding that the City needed to account for differences in land values, based on testimony from City witnesses regarding the purported deficiencies in the land value evidence. The City rests its arguments in part on the undisputed premise that, although the Manual requires consideration of certain possible bases for adjustments, such adjustments might not be necessary in a given case. To the extent that the City means only that an adjustment might not be called for when there is sufficient evidence that buyers and sellers assign similar values to properties in pertinent neighborhoods, the point is surely sound as far as it goes. When there appears to be no reason to adjust based on location then there is nothing to adjust. Accepting that obvious point, we explain below why we reject the City's arguments. In a nutshell, we conclude that the City does not show that

the circuit court erred in determining that the City failed to properly evaluate whether a location-based adjustment was necessary based on the evidence here.

*The City's Consideration of Potential Location Adjustments*

¶37 Beginning with the City's argument that it sufficiently considered the potential for location-based adjustments in its comparative sales analysis, it directs us to the following testimony of its assessor. The assessor testified regarding the challenged assessment here that the assessor considered the option of making a location-based adjustment for the comparable sales, but that the assessor ultimately determined that such an adjustment was not necessary because the increases in values of properties in recent years has been consistently "dramatic[]" across Madison's neighborhoods, including in the neighborhoods containing Matthews' property and all of the comparable properties—both those relied on by the City and those relied on by Matthews. In a somewhat more precise vein, the assessor supervisor, Scott West, testified that residential property sales values in Blackhawk, Hawk's Landing, and assessment area 2 had increased by "similar percent[ages]" in calendar 2022.

¶38 The City appears to argue that this testimony demonstrated beyond dispute that the market for single-family residences across Madison neighborhoods had recently been so consistently strong that there was no point in making adjustments based on location-based differences between individual neighborhoods. In that sense, the City argues that this case is like ***Anic v. Board of Rev. of Town of Wilson***, 2008 WI App 71, 311 Wis. 2d 701, 751 N.W.2d 870. Specifically, the City notes that in ***Anic*** this court upheld the circuit court's decision to credit the testimony of an assessor that the relevant market for lakefront property "had grown so strong that factors other than beach length and

19

beach quality were being ignored by the marketplace." *See id.*, ¶17. In other words, the only features of land or improvements that could call for adjustments would be how long or how attractive a beach was.

¶39 One problem with this argument is that the City witnesses in their testimony did not identify any dynamic clearly analogous to the striking testimony in *Anic* about the beach-fixated market, and therefore the circuit court here lacked anything like the record in *Anic* to consider. Beyond that, the court implicitly found that the City failed to identify market trends that could justify the City's failure in conducting the assessment to account for land values as evidence of the persistence of location-based differences in value between pertinent neighborhoods.

¶40 Explaining further, implied in the circuit court's reasoning was that the court discerned a fundamental defect in the explanations of the City's witnesses regarding the City's decision in conducting the assessment here that adjustments based on the locations of Matthews' property and of comparable properties were not appropriate in the comparable sales analysis.[9] The defect is that the City's approach failed to take the following basic dynamic into account. Even if property values had generally risen at consistent levels across the City's neighborhoods in recent years, the properties in some neighborhoods ended up

---

[9] Implicit findings of a circuit court may be used to support the affirmance of a ruling. *See Laughland v. Beckett*, 2015 WI App 70, ¶20, 365 Wis. 2d 148, 870 N.W.2d 466 (citing *Johnson v. Merta*, 95 Wis. 2d 141, 154, 289 N.W.2d 813 (1980)) (the court of appeals "search[es] the record for evidence to support the court's factual findings"); *Liberty Milk Marketing Coop. v. Nasonville Dairy, Inc.*, 2019 WI App 55, ¶39, 389 Wis. 2d 35, 934 N.W.2d 913 ("when a circuit court fails to make express findings of fact necessary to support its legal conclusion, we assume the court made such findings in a way that supports its decision").

20

with higher values after enjoying the same increases in values due to the fact that those neighborhoods started out with higher dollar values.

¶41　The circuit court did not question that there had been, in recent years, generally consistent percentage increases in property values across Madison neighborhoods, with values in all neighborhoods rising at roughly the same percentage levels. As is evident in the court's questioning of City witnesses, however, the court implicitly recognized that this City-wide trend was not, standing alone, a sufficient basis to ignore potential location-based differences in values among properties used as comparable sales in different neighborhoods. This was because the City employees did not testify regarding the starting points, or base levels, of property values before these generally consistent percentage increases occurred. That is, evident in the court's reasoning was that the City did not account for the simple idea that the typical values of properties in different neighborhoods could vary even after some years of similar percentage increases.

¶42　We conclude that the record reasonably supports the circuit court's implicit determination that the assessment approach testified to by the City employees was defective in that it was premised in part on the proposition that the City-wide trend data alone could show whether location-based adjustments were necessary. This effectively left the City with no evidence establishing how it determined whether a location-based adjustment was necessary for its assessment. We now address the City's arguments on appeal to the contrary.

¶43　The City does not come to grips with this implied reasoning when it directs us to testimony by its assessor supervisor, Scott West, to suggest that, as the City now puts it, "location is inherently considered and valued as part of the trending process applied to residential properties to determine their initial

21

valuation." The City fails to explain how this testimony supports an argument that the circuit court erred in making the express and implied findings that we describe above. As West acknowledged in his testimony, the City's focus on similar City-wide percentage increases in residential property values could fail to take into account whether two neighborhoods experiencing similar value increases "start at different places in the market," with the result that the trends do not change the result that a location-based adjustment could be necessary.

¶44 In a similar vein, the City notes that West testified about how the City generally prepares comparative sales analyses, and the City submits that this included testimony that the City in fact made a location-based adjustment for one of its comparable sales in the assessment here. But this is not an accurate reflection of the record. West noted that *if* the City were to make an adjustment based on location, it would be shown as an "external influence." By "external influence," West was apparently referring to any adjustment to a property's value based on phenomena affecting a property's value based on evidence coming from outside of, or external to, specific features of the land and improvements on the property.[10] This was not inconsistent with Matthews' testimony about his experience as a former assessor, which the circuit court appeared to credit. Matthews testified that when the City conducted a comparative sales analysis it

---

[10] The Manual directs assessors to look beyond the boundaries of the subject property:

> Real property valuation does not exist in a vacuum. It is not enough for the assessor to apply the principles of valuation to a specific property. The assessor must also be aware of the trends and factors that occur on the international, national, and regional levels as well as those factors which have an influence at the neighborhood and municipal levels.

*See* **WPAM** at § 9, p. 13.

would make "influence" adjustments to account for "location or some other external factor that's separate from the property," "such as high traffic, high noise, or positive appeal for some reason." The City notes that here, the City's assessment reflected that the assessor made an adjustment (five percent) based on an "external influence" to only one of the comparable sales relied on by the City in its assessment. But the City fails to address the fact that, in a report submitted by the assessor to the board of review in this case, the assessor explained that this single adjustment was due to the assessor's view that the City's sole comparable sale from Hawk's Landing required an adjustment "for the area['s] uniformly higher quality" homes. The City does not develop an argument that this single adjustment establishes that the circuit court clearly erred in finding that the City did not properly account for location in its comparative sales analysis. For example, this still leaves Matthews' challenge to the City's reliance on the four comparable sales the City identified in the Blackhawk neighborhood, and it does not support the City's failure to account for the land-value disparity between Blackhawk and the other pertinent neighborhoods.

*Circuit Court's Reliance on Land Values*

¶45    As noted above, the City argues that the circuit court erred in relying on land values in determining that the City failed to sufficiently account for location as a potential adjustment in the City's comparative sales analysis. This argument challenges various of Matthews' calculations and also more generally challenges Matthews' reliance on land values as a means to measure location-based differences in value. We address these two sets of contentions in turn.

¶46    The City notes that Matthews described to the circuit court three methods of calculation to identify what he characterized as a "premium," by which

23

he meant the greater values that the market placed on residential properties in Blackhawk (the City's primary comparison neighborhood) as compared to the values in Hawk's Landing (Matthews' sole comparison neighborhood). To repeat, we understand Matthews to have argued at trial that this premium was relevant in showing that Hawk's Landing was more comparable to assessment area 2, but also more broadly to have underscored the flaw in failing to account for location-based differences between Blackhawk and the other two neighborhoods. One of Matthews' methods was to compare the price per square foot of sales of unimproved lots between Blackhawk and Hawk's Landing in 2000 and 2001. Another of his methods was to compare the price per square foot of 2023 sales of properties in each of the two neighborhoods that had similar improvements, those being all properties that were improved by completed, two-story residences. And, in a variation on this last method, Matthews made the same comparison using the same 2023 property sales, but excluded below-grade square footage, consistent with what he described as a convention commonly used by the City.[11] The result of these calculations were three different estimates by Matthews of a Blackhawk-over-Hawk's Landing premium: approximately 22% based on the unimproved lot calculation, and 23% and 28% for the 2023 sales calculations.

¶47 The City asserts that Matthews "did not provide any justification" for using these methods of calculating the premium for Blackhawk over Hawk's Landing. This is not accurate. Matthews testified that the purpose for each of the three types of calculations was to reveal a location-based premium for Blackhawk

---

[11] Matthews testified that, in his opinion based on his experience as an assessor, it was actually more accurate to include below-grade square footage, but he prepared the calculation excluding it in case the City persuaded the circuit court that the convention should be followed.

over Hawk's Landing, both historically (in 2000-01, early in the neighborhoods' development) and in more recent times (2023). And Matthews clearly stated his opinion that the 2023 sales calculation that included below-grade square footage was "the best indicator of the premium" between Blackhawk and Hawk's Landing. So far as the City shows, the circuit court was free to credit this testimony, which supported Matthews' position that, by failing to make location-based adjustments that accounted for Blackhawk's more valuable land, the City artificially inflated the market value of Matthews' property. The City does not establish that the court clearly erred in crediting Matthews' calculations for those particular purposes.

¶48    The City also challenges the reliability of Matthews' seven percent location-based adjustment to Hawk's Landing comparable sales that he used in his own analysis. Specifically, the City asserts that it is unclear from the record what reliable data Matthews used to arrive at seven percent. Regarding the source of the data relied on by Matthews, the City again ignores Matthews' testimony at trial. Matthews testified that he downloaded information from an online data portal made publicly available by the City. Beyond that, the City does not provide a supported argument demonstrating that the circuit court clearly erred in finding Matthews credible regarding his methodology based on the sources of his data.[12]

---

[12] In a thinly developed argument, the City asserts on appeal that Matthews' calculation of a seven percent location-based adjustment should be ignored because it was based on data from sales that occurred in 2023. The City asserts that this is contrary to the Manual's valuation principles, given that the City's assessment was meant to establish the value of Matthews' property as of January 1, 2023. But the City forfeited any such argument based on its failure to make it in the circuit court. *See **State v. Kaczmarski***, 2009 WI App 117, ¶7, 320 Wis. 2d 811, 772 N.W.2d 702. We will not overlook this forfeiture for two reasons. First, the City successfully sought to exclude from trial some exhibits offered by Matthews based on data from after January 1, 2023, but at the same time the City explicitly disclaimed any objection to exhibits submitted by Matthews explaining aspects of his comparative sales analysis, including the seven percent adjustment. Second, overlooking the City's forfeiture on this issue would be inappropriate because Matthews and the circuit court never had the opportunity to consider

(continued)

¶49    In an unclear argument, the City suggests that the testimony of its assessor regarding land values in some manner undermined the reliability of Matthews' use of land values to arrive at his seven percent adjustment to the Hawk's Landing comparable sales. This involves the difference between the value of the land and the value of any improvements on the land in assessing the total value of a property. The assessor acknowledged that assessors are required, pursuant to WIS. STAT. § 70.32(2)(a), to attribute separate values to land versus improvements on a property. Nevertheless, the assessor testified, "it is hard to say [what] meaning" this distinction between the two sets of values can have in measuring the value of a property as a whole.[13] It is not clear what the assessor meant to convey regarding the reliability of the land values that the City is required to assess. But, in any case, the Manual unambiguously instructs that the comparative-sales approach depends on the analysis of how individual attributes of a property contribute to differences in overall market value between compared properties, potentially including attributes specific to the land or specific to improvements. *See* **WPAM** at § 9, pp. 12-14 (listing "location" as "the most important physical factor" for consideration in applying valuation principles that

---

reliability issues based on the age of Matthews' source data. *See* **State v. Ndina**, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612.

[13]    The assessor testified on this topic as follows:

> [E]very single year, we do … mass appraisals.… [W]e consider the total value of the house.… [T]hough we have two different prices, … the land price and the improvement price[][,] ... it is hard to say its meaning.… [W]e are more focused on the total value of the house. So every year, just land prices … are … automatically updated ….

> [T]he most important to the total—the house value. And the … features and ages[,] … we call the effective ages, how the house…the outfit appear to… their ages.

include the principle of "contribution"). We do not discern a viable argument by the City on this topic.

¶50    Also in support of its argument that land values used by Matthews here were unreliable, the City notes that assessor supervisor West testified that the City's attributions of values to land versus values of improvements are subject to potential inaccuracy in the following way. The ratios of total property values to total land values in "newer subdivisions" "are probably up to date." By contrast, for neighborhoods developed in the 1950's, such as Matthews' own assessment area 2, the land values used by the City "have only been … trending along throughout the years." This testimony was opaque. But it could be taken to mean that the land values used by the City in older subdivisions tend to be the product of automatic updating, with the result that more contemporary analysis would reveal them to be inaccurate (although West did not suggest a trend line or direction in which they would tend be erroneous).

¶51    It is not clear what in this testimony the City contends would render Matthews' analysis unreliable or show that any of the circuit court's findings were clearly erroneous. Indeed, West's testimony appeared to reinforce the idea that land values assessed by the City for Blackhawk and Hawk's Landing (the values that Matthews used to derive his seven percent adjustment) tended to be more accurate than older values. In any case, the City falls short of demonstrating that the circuit court could not reasonably credit Matthews' testimony as reliable enough to identify and account for differences in land value between Matthews' neighborhood and the Blackhawk neighborhood—particularly given that the court found that the City failed to properly account at all for the factor of property locations.

¶52    The City emphasizes that the Manual contains a warning about the valuation of land in particular, as opposed to valuing improvements or the property as a whole.  The Manual states that land valuation is relatively more "complex" than improvements valuation and that therefore "very careful research and judgment" are required.  *WPAM* at § 12, pp. 9-15.  For this reason, the Manual explains, assessors should rarely rely on only one means of calculating land value.  *See WPAM* at § 12, p. 9.  But the City does not develop an argument from these concepts that undermines Matthews' approach to land values.  For example, the City does not come to grips with the simple fact that Matthews relied on land values already calculated and made publicly available *by the City itself*.  Further, Matthews' reliance on land values was only one part of his larger comparative analysis.  This leaves unchallenged other aspects of Matthews' comparative sales approach, such as adjustments that he made for lot sizes and the square footage of residences.  *See supra*, note 6.  As noted, we also do not discern the City to argue that Matthews made a mistake in executing the details of his comparative sales analysis that would render his final valuation faulty, or that the circuit court made any math error in determining the excessive tax and costs awarded to Matthews in the judgment.

### D.  Valuation of Matthews' Property

¶53    Having determined that Matthews rebutted the presumption, the circuit court set the City's assessment aside and established the value of Matthews' property for 2023 tax year purposes.  *See Lowe's Home Centers*, 405 Wis. 2d 616, ¶37 ("If … the failure to follow the Manual results in an excessive assessment, then the presumption is overcome and the assessment must be set aside.").  The court credited Matthews' comparative sales analysis as reliable evidence of the value of his property.  The City challenges the reliability of

Matthews' analysis on multiple grounds. For the reasons noted above, we conclude that the City fails to show that the court in its role as fact finder was not free to place weight on Matthews' testimony and analysis regarding valuation of his property, and was not obligated for any reason to adjust the number upward. *See Metropolitan Assocs.*, 379 Wis. 2d 141, ¶25; *Adams Outdoor Advert.*, 294 Wis. 2d 441, ¶27. Summarizing that reasoning, the City fails to show that Matthews' particular use of land values failed to follow the Manual's principles, or was otherwise so unreliable that the circuit court could not rely on it to determine that it reasonably values Matthews' property for tax year 2023.

### III. Forfeiture of the Reassessment Issue

¶54 The City argues that the circuit court erroneously exercised its discretion when, after the court determined that Matthews' property was excessively assessed, the court failed to order that the City reassess the property before deciding what money judgment he might be entitled to. "When a court finds an assessment excessive, it must order a reassessment unless it finds that: (1) proceeding to judgment is in the parties' best interests; and (2) the court is able to determine the amount of unlawful taxes with reasonable certainty." *West Capitol, Inc. v. Village of Sister Bay*, 2014 WI App 52, ¶52, 354 Wis. 2d 130, 848 N.W.2d 875 (citing WIS. STAT. § 74.39(3)). We conclude that the City has forfeited this argument by failing to raise it in the circuit court, *see State v. Kaczmarski*, 2009 WI App 117, ¶7, 320 Wis. 2d 811, 772 N.W.2d 702 (court of appeals generally does not consider arguments not raised in the circuit court), and we further conclude that the City fails to identify a sufficient reason to overlook forfeiture under these circumstances.

¶55 In its motion to dismiss, the City referenced what it referred to as the circuit court's "authority" to order a reassessment under WIS. STAT. § 74.39. In an accompanying letter to the court, the City identified reassessment merely as "one of the remedies available" for the court to use in an excessive assessment action. But we discern no point in the record at which the City requested that the court order that the proceedings be continued so that a reassessment could be performed. *See* § 74.39(1) ("if the court determines that a reassessment of the property upon which the taxes were paid is necessary, the court, before entering judgment, shall continue the action to permit reassessment of the property"). The City's motion and accompanying letter did not reference the findings required for proceeding to a judgment before ordering a reassessment. Nor did the City raise the topic of reassessment during trial, which failed to alert the court to this possibility.

¶56 On appeal the City argues that reassessment under WIS. STAT. § 74.39 is not available under small claims procedures and that this created a competency problem for the circuit court. As a result, according to the City, the court lacked competency because it could not order a reassessment or make the proper findings necessary to proceed to judgment as required by § 74.39.

¶57 The City does not directly address its apparent forfeiture of this argument. The City may intend to argue that there would have been no point in the City raising with the circuit court the potential for a reassessment because the court's decision to deny the City's motion to dismiss and to proceed with the small claims proceeding deprived the City of any chance of pursuing a reassessment. But if this argument is intended, it fails for at least the reason that the City does not direct us to any point in the record at which the City argued that small claims procedures would be inadequate to address an excessive assessment claim like Matthews' due to procedural barriers such as the purported inability of a court

presiding in small claims to order a reassessment. In short, the City fails to show that it alerted the court and Matthews to the issue, and we would have to ignore policies underlying the forfeiture rule to entertain the argument on appeal. *See State v. Ndina*, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612 (one purpose of enforcing the forfeiture rule is to provide incentives for parties to provide opponents and circuit courts with proper notice of an issue and a fair opportunity to address it).

## CONCLUSION

¶58 For all of these reasons, the judgment of the circuit court is affirmed.

*By the Court*.—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.